**James H. Rice Company v. Penn Plate Glass Company.**

Gen. No. 11,591.

1. CONTRACT OF SALE—*what is, as distinguished from one for manufacture and sale.* When a person stipulates for the future sale of articles which he is habitually making, and which at the time are not made or finished, it is essentially a contract of sale as distinguished from a contract for labor.

2. MARKET VALUE—*character of sales essential to establish, of merchandise.* Where the market value of merchandise is sought to be established, it is essential that evidence of sales should be sales of like merchandise, in like quantities and condition as that involved in the litigation, made at a time when the market value was the same as that existing at the time as to which such market value is sought to be fixed.

3. MEASURE OF DAMAGES—*what is, where merchandise contracted to be purchased is not accepted as per contract.* In such case where the vendee has agreed to a sale by the vendor of the rejected merchandise the difference between the sum remaining due on the contract price and the total amount of sales made pursuant to such agreement is the true measure of damages.

Action of assumpsit. Appeal from the Circuit Court of Cook County; the Hon. EDWARD P. VAIL, Judge, presiding. Heard in this court at the October term, 1903. Reversed and judgment here. Opinion filed December 15, 1904.

SMOOT & EYER, for appellant.

WINSTON, PAYNE & STRAWN, for appellee; JOHN BARTON PAYNE, of counsel.

James H. Rice Co. v. Penn Plate Glass Co.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment for the sum of $16,595.20, recovered by appellee in an action of assumpsit by it against appellant for damages for breach of contract.

The cause was tried by the court, a jury being waived by agreement of the parties. The nature of the case is fully stated in our opinion in the former appeal, James H. Rice Co. v. Penn Plate Glass Co., 88 Ill. App. 407, and the contract between the parties, for breach of which the suit was brought, is set out in full in that opinion.

Appellee, by contract with appellant of date June 26, 1896, sold to appellant 120,000 square feet of polished plate glass, stock sheets. The following table shows the different brackets in which the glass was to be delivered, the percentage of the 120,000 feet sold in each bracket, carried out in square feet, and the price per square foot of each bracket, the total cost of the square feet in each bracket, and the total cost of the whole 120,000 feet.

| BRACKETS. | PER CENT. | FEET. | PRICE. | TOTAL. |
|---|---|---|---|---|
| 1–3 | 5% | 6,000 | 18 cts. | $1,080 00 |
| 3–5 | 10% | 12,000 | 21 " | 2,520 00 |
| 5–10 | 21% | 25,200 | 38 " | 9,576 00 |
| 10–25 | 25% | 30,000 | 52 " | 15,600 00 |
| 25–50 | 22% | 26,400 | 57 " | 15,048 00 |
| 50–100 | 15% | 18,000 | 61 " | 10,980 00 |
| 100–120 | 2% | 2,400 | 63 " | 1,512 00 |
| | 100% | 120,000 | | $56,316 00 |

The appellee is a Pennsylvania corporation; its factory is in Irwin, Pennsylvania; and appellant is an Illinois corporation; and by the contract, appellee agreed as follows: "Shipments of glass shall be made monthly, in lots of 10,000 feet, more or less, every month, beginning first day of November, 1896, and ending the last day of October, 1897, the above prices to be f. o. b. at Irwin, Pennsylvania."

February 25, 1897, after the appellee had shipped to appellant, and the latter had received and paid for 35,345 feet of the glass, appellant wrote to appellee the following

letter: · " Matters have come to such a condition with this company that we are unable to accept or pay for any further shipments of glass, and we notify you not to manufacture or ship any more glass for our account, from and after this date. No trade, no collections, and, therefore, no money." March 1, 1897, appellee wrote to appellant, stating it was at a loss to understand the above letter, and notifying appellant that it held itself in readiness to perform its part of the contract, and that it would continue shipping; to which appellant March 3, 1897, replied that there should be no misunderstanding of its letter; that it meant just what it said. On receiving this communication appellee wrote to appellant that it understood from appellant's letter that it repudiated its contract. There was still due on the February delivery, when appellant refused to receive any more glass on the contract, 4,500 feet, and it appears from the evidence that appellee had, March 1, 1897, sufficient glass on hand to complete the February delivery. The glass delivered, 35,345 square feet, left 84,655 feet deliverable under the contract, and the sum paid by appellant for the glass delivered to it, $18,072.15, left $38,243.15 due under the contract. In James H. Rice Co. v. Penn Plate Glass Co., 88 Ill. App. 407, we held that the measure of damages as to glass manufactured and on hand ready for delivery, prior to the receipt of appellant's letter of February 25 by appellee, was the difference between the contract price and the market price or value at the place of delivery, if the former was greater than the latter, and that the measure of damages as to the glass not manufactured in pursuance of the contract, when appellee received that letter, was the difference between the contract price and the cost of manufacture, if the former was greater than the latter. In the present appeal counsel for appellant contend that the contract is merely a contract of sale and not one for manufacture and sale, and cite the following cases in support of the proposition, which we think fully sustain it: Lamb v. Crafts, 12 Metc. 353; Clark v. Nichols, 107 Mass. 547; Goddard v. Binney, 115 Mass. 450; Prescott v. Locke, 51 N. H.

94; Sawyer v. Ware, 36 Ala. 675; Brown v. Sanborn, 21 Minn. 402.

In Lamb v. Crafts, *supra*, the contract sued on is thus stated in the opinion: "The facts, about which there is no controversy, or none of any importance, are, that in October, 1844, the plaintiff applied to the defendant, whose employment was that of collecting rough tallow and preparing it for market, to purchase one hundred casks of tallow, of good quality and color, to ship to London; that the defendant said he knew what the plaintiff wanted, and could furnish such an article, but was doubtful whether he could furnish the required quantity within the time limited. The negotiation resulted in an agreement, the one to furnish and the other to take, at a fixed price per pound, fifty casks absolutely, and fifty more, if the defendant could get them ready, or such portion of them as he could get ready, to be delivered at the vessel or vessels designated by the plaintiff. They were subsequently delivered on board of two vessels, and two separate bills of parcels were made and signed by the defendant, in which the article was described as 'tallow,' without other description or designation, and the quantity was paid for by the plaintiff." Shaw, C. J., delivering the opinion, said: "It was intimated, but not pressed, that this case was not within the Statute of Frauds, because the tallow was to be prepared or manufactured. But we think it very clear that the objection cannot prevail. The distinction, we believe, is now well understood. When a person stipulates for the future sale of articles, which he is habitually making, and which, at the time, are not made or finished, it is essentially a contract of sale, and not a contract for labor; otherwise, when the article is made pursuant to an agreement," citing cases. See, also, Browne on Statute of Frauds, sections 307 and 308, and Benjamin on Sales, 6th Am. ed., p. 104, "American notes."

There is some conflict in the American decisions, but we think the doctrine stated by Chief Justice Shaw is sustained by the greater weight of authority and the better reason. In the present case the appellee was a manufacturer of

glass for general sale in the market, of the sizes and description contracted for by appellant; no special pattern, such as appellee was not in the habit of manufacturing and selling, is included in the contract, and the words of the contract are, "That the said party of the first part does hereby agree to sell, and does sell, to the said party of the second part," etc. There is no provision in the contract making it obligatory on appellee to manufacture the glass. It was left free to procure the glass from a third party to fulfill its part of the contract, had it seen fit so to do, and appellant could not legally refuse to receive glass so procured, if answering the description in the contract.

The error of the court in its opinion in the former appeal, for which, probably, the writer is mainly responsible, was induced by the fact that appellee is a manufacturer of such glass as is described in the contract, and that the parties, while they did not so contract, contemplated that appellee would manufacture the glass, as is evidenced by appellant's letter of February 25, 1897, and by the following language in the contract: "This agreement is subject to delays caused by strikes of the employes, or by fire, action of the elements, or other causes not under control of the party of the first part."

Evidence was introduced both on the theory that the measure of damages as to the undelivered glass was as stated by the court in its former opinion, and on the theory that the measure of damages as to such glass is the difference between the contract price and the market price or value, at the time of the breach. The court assessed the damages, applying the measure of damages as directed by the court in its former opinion, and entered judgment on its finding; but also found specially that, applying, as the measure of damages, the difference between the contract price and the market price or value, at the time of the breach, the damages were $16,293.78. Premising the following definitions of terms used in the contract, we will next consider the evidence. Stock sheets are the sheets of glass which, when taken from the machines, are squared and

James H. Rice Co. v. Penn Plate Glass Co.

put in stock. They are of different sizes. Bracket is a word used to designate an imaginary line; 1 to 3 bracket means a sheet of glass of one square foot in width and not to exceed, in contents, three square feet; 3 to 5, a bracket containing not less than three nor more than five square feet; and so as to the other brackets mentioned in the contract. The record and appellee's brief contain a maze of figures and estimates, to go through which would seem to require an Ariadne thread; but, in the view we take, it will only be necessary to consider a few of them. As stated in our former opinion in the cause, the value to be ascertained is the market price at the time of the breach, and the price obtained for like goods on a sale, or sales, within a reasonable time after the breach, would be evidence of the market price or value at the time of the breach. The weight of the evidence is that, at the time of the breach, the market for glass had become demoralized, for reasons stated by the witnesses, which need not be here repeated, and that there was not then, nor for months thereafter, any market price; any price which could reasonably be quoted as the market price.

The appellee put in evidence a sale by it to the James E. Patton Co. of Milwaukee, Wisconsin, March 9, 1897, of 30,000 square feet of glass, as shown by the following table:

"PATTON SALE 30,000 FEET.

| BRACKET. | PER CENT. | FEET. | PRICE. | TOTAL. |
|---|---|---|---|---|
| 10–25 | 10 | 3,000 | 50 cts. | $ 1,500 |
| 25–50 | 30 | 9,000 | 54 " | 4,860 |
| 50–100 | 50 | 15,000 | 58 " | 8,700 |
| 100–120 | 10 | 3,000 | 60 " | 1,800 |
| | 100 | 30,000 | | $16,860 |
| Less 25 per cent...................... | | | | 4,215 |
| | | | | $12,645." |

This sale was not evidence of the market price or value of the glass described in the contract between appellant

and appellee. The evidence is that the smaller brackets, 1 to 3, 3 to 5 and 5 to 10, were sold to jobbers at a much less price than the larger brackets, and for little or no profit, for reasons fully stated in the evidence. In the contract between appellant and appellee, the small brackets are thirty-six per cent of the 120,000 feet sold, or 43,200 feet, so that in that contract the average price per square foot of the entire 120,000 feet was necessarily much less than had it contained only larger brackets, as in the Patton Company contract.

In Bagley v. Findlay, 82 Ill. 524, the court, speaking of the market price, say : "And this means the market price of such goods, in such condition and in such quantity as the goods were at the time for delivery."

Other sales were made by appellee running from September 1 to October 23, each sale containing a very much less percentage of small brackets than the contract in question, and when, as the evidence shows, the value of glass in the market had fallen much below what it was at the time of the breach. These sales which are shown in a table hereinafter inserted, are not evidence of market price or value at the time of the breach. There is no evidence of market price or value which warrants so large damages as the court assessed.

Mr. Kenny, appellant's vice-president, who made the contract with appellee, testified that March 31, 1897, after appellant had refused to receive any more of the glass contracted for, he had an interview with Mr. Kann, appellee's president, in respect to the undelivered glass, and that he, Kenny, insisted that Mr. Kann should sell the undelivered glass on appellant's account, and Kann said he would do as he pleased about it. Mr. J. Garty, appellant's secretary, testified that Mr. Kenny said to him in Kann's presence, "Garty, I have made a proposition to Mr. Kann in regard to this glass. I want him to go on the market and sell this glass at the very best price he can, as he is in a better condition to sell it than we are. He will do better, get better prices for it than we can get for it. I will pay him

whatever the difference may be. I will pay all his expenses, and I will pay him $1,000 for his trouble." He also testified that Mr. Kann said he would do as he pleased about the matter.

It appears from the evidence that appellant was a jobber and that, among jobbers, it was considered bad policy, and might create suspicion for one jobber to sell to another, his competitor in the market. In June, 1896, about all the product of appellee's factory for the year was contracted for, and sales thereafter were made, as was the case in the contract in question, for future delivery. Mr. Kann, at the time of the interview with Kenny, had sold 30,000 feet to the Patton Co. He elected to consider this sale as a part of the 84,655 feet undelivered under the contract with appellant, and the evidence clearly shows that he made numerous efforts to sell the remainder, namely, 54,655 feet, and finally, October 23, 1897, had sold it all as shown by the following table:

"SALES OF GLASS MADE IN 1897.

| 1897 | | 1-3 | 3-5 | 5-10 | 10-25 | 25-50 | 50-100 | 100-120 | Total | $ |
|---|---|---|---|---|---|---|---|---|---|---|
| Mar. 13 | Patton .... | 7 | 4 | | 582 | 1,777 | 2,703 | 517 | 5,590 | 2,347 82 |
| " 31 | " .... | 7 | 5 | 7 | 515 | 1,793 | 2,581 | 580 | 5,488 | 2,306 84 |
| Apr. 12 | " .... | 9 | 9 | 6 | 522 | 1,603 | 2,665 | 454 | 5.268 | 2.212 81 |
| Apr. 21 | " .... | 13 | 8 | 6 | 581 | 2,322 | 3,266 | 540 | 6,736 | 2,826 52 |
| May 6 | " .... | 12 | 9 | | 828 | 1,514 | 3,932 | 757 | 7,052 | 2,977 41 |
| July 10 | " .... | 7 | 5 | 670 | 569 | 2,310 | 3,008 | 207 | 6,776 | 2,063 96 |
| July 24 | " .... | 14 | 10 | 1,019 | 1,101 | 2,085 | 2,406 | 990 | 7,625 | 2,280 30 |
| Aug. 6 | " .... | 409 | 1,297 | 1,989 | 1,601 | 2,248 | 2,185 | 4,261 | 10,155 | 2,621 39 |
| Aug. 20 | " .... | 11 | 9 | 8 | 25 | 1,639 | 3,156 | 961 | 5,809 | 1,872 73 |
| Sep. 1 | " .... | 5 | 4 | 51 | 1,119 | 4,405 | 546 | | 6,130 | 1,989 72 |
| " 16 | Masson.... | 838 | 1,163 | 503 | | | | | 2,504 | 537 06 |
| " 25 | Chgo.   M. & A. G. Co. | 458 | 592 | | | | | | 1,050 | 175 24 |
| Oct. 6 | Reid....... | 401 | 442 | 661 | 1,000 | 1,859 | 2,514 | 941 | 7,818 | 2,685 72 |
| Oct. 23 | " ....... | 82 | 175 | 418 | 983 | 1,115 | 1,240 | 440 | 4,453 | 1,534 00 |
| Oct. 19 | Masson.... | 1,071 | 622 | 508 | | | | | 2,201 | 691 03 |
| | | 3,344 | 4,354 | 5,846 | 9,426 | 24,670 | 30,202 | 6,813 | 84,655 | 29,122 55." |

Having substantially agreed on a sale of the glass by appellee, and appellee having sold it as the Rice Company glass, neither party can reasonably complain of the damages being assessed as the difference between the total amount of these sales and the sum remaining due on the contract price, viz., $38,243.85. Mr. Kann testified positively that he treated the sale to the Patton Co. as a sale of appellant's glass, and repeatedly testified that he sold

the remainder of the undelivered glass, 54,655 feet, as appellant's glass. Appellant requested him to sell the undelivered glass, and appellant's counsel, in their argument, say : " The plaintiff went on and made the glass, and went into the market and sold it, and recovered for the 84,655 feet, $29,122.55. If defendant had carried out its contract with plaintiff, plaintiff would have received for the undelivered glass $38,243.84. The difference is $9,121.29, which represents the actual loss to plaintiff." The cents in the first sum should be 85 instead of 84, and the cents in the latter sum should be 30 instead of 29.

The judgment will be reversed on the ground that the damages are excessive, and judgment will be rendered here in favor of appellee for the sum of $9,121.30.

*Reversed and judgment here.*